<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

D.E.R. and S.R., individually and on behalf of D.R.

                             Plaintiffs,

    v.

BOARD OF EDUCATION OF THE BOROUGH OF RAMSEY

                             Defendant.

Civil Action No. 04-2274 (DRD)

**O P I N I O N**

<u>Appearances</u>

Rebecca K. Spar, Esq.
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
A Professional Corporation
25 Main Street
Hackensack, NJ  07601

    *Attorney for Plaintiff*s

Eric L. Harrison, Esq..
METHFESSEL & WERBEL, ESQS.
3 Ethel Road, Suite 300
PO Box 3012
Edison, NJ 08818

    *Attorney for Defendant*

**OPINION**

**DEBEVOISE, Senior District Judge**

Plaintiffs D.E.R. and S.R., individually and on behalf of their child D.R. (collectively,

"Plaintiffs" or the "R.s"), filed this action to challenge the OAL decision and to allege violations

of the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400, et seq.[1],

Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, the Americans with

Disabilities Act (the "ADA"), 42 U.S.C. § 12132, and New Jersey's Special Education Law,

N.J.S.A. 18A:46-1 et seq.  Presently before the court are cross-motions for summary judgment.

For the reasons set forth below, the OAL decision will be reversed, and summary judgment will

be granted to the R.s with respect to the issues of:

I.      the least restrictive environment in eighth grade Social Studies class and availability of

        accommodations and modifications;

II.     "exposure" to the eighth grade Science curriculum without measurable goals and

        objectives and grading on a pass/fail basis; and

III.    the appropriateness of the Step Up Program and the involvement of nondisabled peers in

        D.R.'s social skills training.

Summary judgment will be granted to Ramsey with respect to the R.s' discrimination claims

under Section 504 and the ADA.  Lastly, as a prevailing party in the due process hearing, the R.s

will be awarded attorney's fees and costs of $44,691.36.

## *FACTS*

        Plaintiff D.R. (together with his parents D.E.R. and S.R., the "R.s" or "Plaintiffs") is a

student with disabilities who is eligible for special education and related services under the

---

[1]In December 2004, Congress amended the IDEA.  See Individuals with Disabilities
Education Act Amendments of 2004, Pub. L. No. 108-446.  However, since the events relevant
to this litigation occurred prior to the Amendments' effective date of July 1, 2005, this opinion
will be based on the IDEA in effect before July 1, 2005.

IDEA. D.R. is also a qualified individual with a disability as defined in Section 504 of the

Rehabilitation Act and the ADA. D.R. has been diagnosed with specific learning disability,

communication impairment, attention deficit hyperactivity disorder, and juvenile onset bipolar

disorder. The R.s reside in the Town of Ramsey, County of Bergen and State of New Jersey.

Defendant Ramsey Board of Education ("Ramsey" or "Defendant") is charged with the

conduct, supervision, and management of the Ramsey public schools, which is the school system

established to provide a public education to children residing in Ramsey. Defendant Ramsey

receives federal financial assistance and is a public entity as defined in Title II of the ADA, 42

U.S.C. § 12131(1).

The modifications and accommodations contained in the IEP governing his 2003-04

school year included, among other things:

   1. giving D.R. extra time to complete assigned work;
   2. allowing D.R. to retake tests;
   3. giving D.R. class notes; and
   4. allowing D.R. to use Inspiration/Kidspiration software to help with the writing process.

In July 2003, Plaintiffs filed the due process petition that has culminated in the instant

action. The due process petition objected to certain components of the proposed Individualized

Education Plan ("IEP") for the 2003-04 school year, D.R.'s eighth grade year. The due process

petition was transmitted to the Office of Administrative Law ("OAL") for a hearing which began

on August 27 and continued on December 1, 4 and 9, 2003 and January 27, 29 and 30, 2004.

The R.s filed two applications for emergency relief. On or about August 27, 2003, the

ALJ granted the R.s' first request for emergency relief and ordered Ramsey to implement the

stay-put provision by continuing D.R.'s placement in a mainstream[2] eighth grade Social Studies class rather than the resource Social Studies class proposed in the IEP. Ramsey complied with the order, and D.R. spent his eighth grade year in the mainstream Social Studies class with a 1:1 aide and an in-class support teacher of the handicapped. On or about February 5, 2004, the ALJ granted the R.s' second request for emergency relief and ordered Ramsey to allow D.R. to take the Grade Eight Proficiency Assessment ("GEPA") and to participate in the math preparation class for the GEPA. Ramsey complied with this order and D.R. took the GEPA.

Before the final OAL decision was entered, the parties agreed by consent order that the Director of Special Services would not attend that portion of IEP meetings in which D.R.'s transitional needs and services are discussed and that the administrative record would be sealed.

On or about March 26, 2004, the ALJ issued a decision in which she ruled in favor of Ramsey with respect to the following issues, which are currently on appeal before the court:

> (1) the ALJ concluded that Ramsey's proposal to place D.R. in a resource Social Studies class rather than a mainstream Social Studies class did not deny D.R. a FAPE;

> (2) the ALJ ruled that Ramsey was appropriately applying modifications and accommodations as required by D.R.'s specific needs, and that Ramsey was not required to employ a consultant to confer with science and social studies regular and special education teachers regarding modifications to D.R.'s curriculum;

> (3) the ALJ concluded that Ramsey's proposal to measure D.R.'s progress in Science class with pass/fail rather than letter grades was appropriate; and

> (4) the ALJ affirmed the placement of D.R. in the "Step Up Social Skills Training Program" for school year 2003 and ordered the child study team to revisit this related service for school year 2004.

---

[2]"Mainstream" and "general" are used interchangeably in the record and will also be used interchangeably in this opinion to refer to the class in which nondisabled students are enrolled.

The Complaint in the instant action contains three counts.  Count One seeks attorney's fees and costs, pursuant to 20 U.S.C. § 1415(i)(3)(B), associated with the prosecution of the due process petition and specifically for prevailing on issues in the August 27, 2003, February 5, 2004, and April 14, 2004 orders of the ALJ.  In Count Two, the R.s seek reversal of the ALJ's rulings and judgment in their favor finding that Ramsey failed to provide D.R. with a free appropriate public education in the least restrictive environment in violation of the IDEA.  Count Three alleges that Ramsey violated Section 504 and the ADA by: (1) giving D.R. a pass/fail grade in his Science class and (2) pulling D.R. out of classes for social skills instruction.

### *STANDARD OF REVIEW*

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met this burden, the burden then shifts to the non-moving party.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Moreover, she may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."  Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Rather, she must "set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

5

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. <u>Id.</u> at 247. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the non-moving party. <u>Pollock v. American Tel. & Tel. Long Lines</u>, 794 F.2d 860, 864 (3d Cir. 1986).

"Summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." <u>A.S. ex rel. S. v. Norwalk Bd. of Educ.</u>, 183 F. Supp. 2d 534, 539 (D. Conn. 2002) (citation omitted). "The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA'S processes and that the child's educational needs have been appropriately addressed." <u>Antonaccio v. Bd. of Educ.</u>, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003) (citing <u>A.S. ex rel. S. v. Norwalk Bd. of Educ.</u>, 183 F. Supp. 2d 534, 539 (D. Conn. 2002)).

In administrative and judicial proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed. <u>Carlisle Area Sch. Dist. v. Scott P.</u>, 62 F.3d 520, 533 (3d Cir. 1995) (citations omitted). When reviewing an administrative decision, the court "shall receive the record of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). "Due weight" should be given to the administrative proceedings. <u>Bd. of Educ. of the Hendrick Hudson Cent. School</u>

6

<u>Dist. v. Rowley</u>, 458 U.S. 176, 188-89, 205-06 (1982).  Where the district court hears additional evidence that was not before the ALJ, the district court is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act."  <u>S.H. v. State-Operated Sch. Dist. of Newark</u>, 336 F.3d 260, 270 (3d Cir. 2003) (citing <u>Oberti</u>, 995 F.2d 1204, 1220 (3d Cir. 1993)). The court should not substitute its own notions of sound education policy for those of the educational agencies they review.  <u>Id.</u>

*DISCUSSION*

**I.  Mootness**

Before reaching the merits of the R.s' claims, the issue of mootness will be considered. Ramsey argues that the Complaint should be dismissed because the R.s' claims are moot and the R.s have not been damaged.  The R.s contend that their claims are not moot and should be addressed on their merits.  For the reasons set forth below, Ramsey's mootness argument will not prevail.

"A case becomes moot if (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  <u>Jersey Cent. Power & Light Co. v. Lacey</u>, 772 F.2d 1103, 1108 (3d Cir. 1985) (citations omitted).  If a defendant has discontinued the challenged activities and there is no reasonable expectation that the wrong will be repeated, the case is moot.  <u>Jersey Cent. Power & Light Co. v. Lacey</u>, 772 F.2d 1103, 1108 (3d Cir. 1985).

Claims are not considered moot if the conduct originally complained of is "capable of repetition, yet evading review," <u>Honig v. Doe</u>, 484 U.S. 305, 318 (U.S. 1988), or in other words:

7

(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the complaining party would be subjected to the same action again.  Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1008 n.7 (3d Cir. 1995).  In Rowley, the school district argued that the district court erred in reviewing an IEP after the school year had ended and before the school administrators were able to develop another IEP for subsequent years.  458 U.S. at 186 n.9.  The Supreme Court rejected this argument, observing that "[j]udicial review invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings."  Id.  The Supreme Court found that the length of time needed to resolve the dispute through the administrative and judicial process warranted the retention of jurisdiction by the district court because the alleged deficiencies in the IEP were capable of repetition as to the parties before the court, yet would evade judicial review if the district court did not retain jurisdiction.  Id.  A school year is not long enough for the administrative due process and judicial review proceedings provided under the IDEA to take their course.  Oberti v. Bd. of Educ. of Clementon Sch. Dist., 995 F.2d 1204, 1213 n.14 (3d Cir. 1993).

The claims at issue in this action fall squarely within the "capable of repetition, yet evading review" exception to the mootness doctrine.  Neither the expiration of the 2003-04 school year (to which the IEP at issue pertains) nor D.R.'s attendance at a private school for the 2004-05 school year renders the dispute moot.  The record shows a history of litigated disputes between the R.s and Ramsey concerning the provision of an appropriate education in the least restrictive environment for D.R.  The conduct complained of in this action – i.e., Ramsey's proposals to place D.R. in a resource class, grade him on a pass/fail basis, "expose" him to

8

curriculum without measurable goals and objectives, provide modifications and accommodations on a case-by-case basis, provide one-on-one social skills training rather than with nondisabled peers – are capable of repetition.  For example, the determination of the least restrictive environment ("LRE") is an issue that must be addressed each time an IEP is prepared and has been a recurring issue throughout D.R.'s education.  D.R. was born on December 1, 1989 and may be entitled to special education services until he is 21 years old or graduates from high school.  See 20 U.S.C. § 1412.  During this time, Ramsey is responsible for providing a FAPE in the LRE to D.R., whether D.R. attends Ramsey High School or a private school.  Moreover, the R.s "remain interested" in having D.R. educated at Ramsey High School in the future.  At oral argument, counsel for the R.s explained that an IEP for the upcoming 2005-06 school year had not been proposed yet, but that the R.s reserve their right to file a due process petition should they disagree with Ramsey's future proposals.

As for the alleged harm suffered by the R.s, it is true that, despite Ramsey's proposals, the R.s got essentially what they wanted in that D.R. remained in general Social Studies class and received letter grades for most of his eighth grade year as well as his final grade in Science class. In addition to complaining about Social Studies class placement and Science grades, however, the R.s also complain of Ramsey's alleged failure to provide: appropriate modifications and accommodations to aid D.R. in the Social Studies class; notice of pass/fail grading in Science class; measurable goals and objectives for Science class; and social skills training.  Whether D.R. has suffered any damage from these alleged failures cannot be determined without reaching the merits of this action.  On its face, the Complaint appears to allege harm suffered.

Accordingly, the claims are not moot.

9

**II.  Social Studies class – LRE and accommodations and modifications**[3]

The R.s raise two related issues with respect to D.R.'s eighth grade Social Studies

education.  First, the R.s allege that the ALJ erred in not determining whether the general Social

Studies class was the least restrictive environment in which D.R. could receive an appropriate

education.  In fact, the OAL opinion issued by the ALJ did not discuss the LRE issue; nor did the

ALJ rule that the general Social Studies class would not provide D.R. a FAPE.  Rather, the ALJ

only ruled that the resource Social Studies class provided a FAPE.[4]  Ramsey contends that the

ALJ's failure to make specific findings with respect to whether the general Social Studies class

was the LRE is immaterial because the general Social Studies class was inappropriate for D.R.

even with accommodations and modifications.  Second, the R.s allege that Ramsey failed to

provide appropriate accommodations and modifications (or supplementary aids and services) to

aid D.R. in the general Social Studies class which, pursuant to the stay-put provision, D.R.

attended despite Ramsey's proposal to educate D.R. in a resource Social Studies class.  Ramsey

argues that its staff were applying appropriate and substantial modifications and accommodations

as required by D.R.'s needs, and that further modifications to the curriculum would have

effectively eliminated the actual course content of the general Social Studies class.  Ramsey

argues that, contrary to the assertion of the R.s, the listing of accommodations in an IEP does not

---

[3]It is unclear whether the OAL decision concerning the provision of accommodations and modifications relates to their provision in both Social Studies and Science class.  Based on the R.s' moving brief, it appears that the issue on appeal concerns the provision of accommodations and modifications in Social Studies class.  Therefore, the issue of accommodations and modifications will be addressed in this section under "*(A) Supplementary aids and services*; *accommodations and modifications in IEP*."

[4]According to Ramsey, the curriculum of the resource Social Studies class parallels that of the mainstream Social Studies class but at a much slower pace and with fewer students.

require their constant implementation without regard for the task in question, the capabilities of the student and the demands of the curriculum.

The IDEA requires that children with disabilities be educated in the least restrictive environment, *i.e.*, in regular classes with nondisabled children "to the maximum extent appropriate" and that "special classes . . . or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.550; N.J.A.C. 6A:14-4.2. This provision sets forth a "strong congressional preference" for integrating children with disabilities in regular classrooms. Oberti, 995 F.2d at 1213-14. In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs. 34 C.F.R. § 300.552(d). A child with disabilities should not removed from regular classes solely because of needed modifications in the general curriculum. 34 C.F.R. § 300.552(e). The IDEA does not require that a student demonstrate achievement of a specific performance level as a prerequisite for placement into a regular classroom. 34 C.F.R. Part 300 Appendix A. The Court of Appeals has construed the IDEA's "mainstreaming requirement to prohibit a school from placing a child with disabilities outside of a regular classroom if educating the child in the regular classroom, with supplementary aids and support services, can be achieved satisfactorily." Oberti, 995 F.2d at 1207. The school district bears the burden of proving compliance with the mainstreaming requirement. Id.

The parties agree that the ALJ failed to examine the LRE requirement. This failure warrants reversal of the ALJ's approval of Ramsey's proposal to place D.R. in a resource Social

Studies class rather than the general Social Studies class.  Inquiry into the LRE cannot be

dismissed as immaterial because the LRE requirement is critical under the IDEA.  In this case,

the record shows that before the eighth grade year commenced, there was evidence that D.R.

could be educated satisfactorily in a general eighth grade Social Studies class.  D.R. had been

educated in general Social Studies classes since third grade and received passing grades in all of

his classes from third through eighth grades.  D.R. received a final grade of B- in his general

seventh grade Social Studies class; the ALJ noted that the Director of Special Services

acknowledged that D.R. performed well in mainstream Social Studies.  (Spar Aff. Ex. B. at 4.)  A

comparison of D.R.'s performance on standardized tests administered in January 2001 and July

2003 show that D.R.'s knowledge in Science, Social Studies and Humanities increased from a

4.1 grade equivalent in 2001 to a 7.1 grade equivalent in 2003.  (Spar Aff. Ex. J, item 52.)

During this same period, D.R.'s reading vocabulary increased from 1.7 grade equivalent to 5.8,

his "picture vocabulary" from 8.3 to 10.3 grade equivalent, and his oral comprehension improved

from 3.0 to 7.1 grade equivalent, which according to Dr. Balaban were average scores.  His

private providers, Dr. Balaban and Dr. Plasner, both testified that D.R. was able to learn and

retain material.  With respect to his lower than average scores, Dr. Balaban noted that D.R.

nevertheless has made progress.  (1/29/04 Tr. at 25:22 – 26:16.)  D.R.'s significant academic

progress and history of success in mainstream classes should have indicated to Ramsey that

serious consideration should have been given to D.R.'s placement in the LRE.  Ramsey bears the

burden of proving that its proposal to place D.R. in the resource Social Studies class was in

compliance with the LRE requirement of the IDEA.  Oberti, 995 F.2d at 1219-20.

        In Oberti, the Court of Appeals adopted a two-part test for determining whether a school

is in compliance with the IDEA's LRE requirement.  The first prong is whether education in the

regular classroom, with the use of supplementary aids and services, can be achieved

satisfactorily.  Id. at 1215.  In deciding the first prong, at least three factors should be considered:

(A) whether the school district has made reasonable efforts to accommodate the child in a regular

classroom with supplementary aids and services; (B) the educational benefits available to the

disabled child in a regular class, with appropriate supplementary aids and services, as compared

to the benefits provided in a special education class; and (C) the possible negative effects of the

inclusion of the child on the education of the other students in the class.  Id. at 1217-18; see also

Kingwood Township Bd. of Educ., 205 F.3d 572, 579 (3d Cir. 2000).  If, after considering these

factors, the court determines that the school district was justified in removing the child from the

regular classroom and placing him in a self-contained special education class, the second prong

requires the examination of whether the school has included the child in school programs with

nondisabled children to the maximum extent possible.  Oberti, 995 F.2d at 1218.

Because Ramsey has failed to show that Social Studies education in the regular

classroom, with the use of supplementary aids and services, could not be achieved satisfactorily,

summary judgment will be granted to the R.s.

*(A)  Supplementary aids and services*; *accommodations and modifications in IEP*

The IDEA "requires the IEP team to determine, and the public agency to provide, the

accommodations, modifications, supports, and supplementary aids and services, needed by each

child with a disability to successfully be involved in and progress in the general curriculum

achieve the goals of the IEP . . ."  34 C.F.R. Part 300 Appendix A.  When providing

accommodations to a disabled child, the school district "must consider the whole range of

supplemental aids and services" and "must also make efforts to modify the regular education program to accommodate a disabled child." Oberti, 995 F.2d at 1216.  The school district must give serious consideration when deciding what accommodations to provide and modifications to make; mere token gestures are insufficient to meeting the broad requirements of accommodation. Id.  Failure to consider and implement appropriate accommodations and modifications may violate the IDEA's LRE requirement.  Id.

Due to his disabilities, D.R. has difficulty reading.  Christine Murphy, D.R.'s case manager, testified that the disparity between D.R.'s writing and reading levels and the reading level of the eighth grade Social Studies textbook meant that a segregated special education class would be better.  Assuming that Ramsey's concerns about reading levels and writing demands were justified, Dr. Balaban opined that these concerns could be addressed by providing accommodations and modifications while allowing D.R. to remain in the general Social Studies class.  For example, the R.s requested that reading material be given to D.R. in advance to preview at home or that he be allowed to use the Kurzweil software and head phones so that the material could be read to him in the mainstream Social Studies class.  Dr. Balaban also testified that giving D.R. study guides or class notes to simplify the material would help D.R. to learn the material.  D.R.'s IEP provided that he was to receive class notes, study guides, simplified versions of the material and vocabulary to review in advance.  Dr. Balaban testified that Warren Young, D.R.'s 1:1 aide, did not provide these accommodations because D.R. was attending a mainstream Social Studies class.  (1/29/04 Tr. at 51:16-21.)

Ramsey's defense with respect to providing supplementary aid and services in Social Studies class is twofold: (1) Ramsey contends that it provided substantial accommodations and

14

modifications, and further modifications to the curriculum would have effectively eliminated the actual course content of the general Social Studies class; and (2) Ramsey argues that accommodations and modifications – even those contained in an IEP – should be provided at teachers' discretion and need not be provided at all times without regard for the task in question, the capabilities of the student and the demands of the curriculum. These arguments are unpersuasive for the following reasons.

First, Ramsey has not shown that it considered the whole range of supplementary aids and services, nor has it shown that the accommodations and modifications proposed by Plaintiffs or contained in D.R.'s IEP could not have been implemented to tackle Ramsey's concern that the reading materials used in the mainstream Social Studies class were above D.R.'s reading level. Although D.R.'s learning disabilities may impede his reading skills, he learns more easily by listening. Therefore, Ramsey should have considered and provided accommodations that would have allowed D.R. to learn using his stronger skills and to be more fully involved in and progress in the general Social Studies curriculum. The accommodations proposed by the R.s or Dr. Balaban – such as allowing D.R. to preview reading material or use the Kurzweil in class, or giving D.R. study guides, class notes, simplified material and vocabulary to review in advance – would have provided individually tailored methods to address D.R.'s learning disabilities. Although Ramsey has expressed difficulty in using the Kurzweil during class, the other accommodations do not appear to impose any difficulty or distraction in class.

In addition to not providing reasonable supplementary aid and services to help D.R. learn while he was in the mainstream Social Studies class, Ramsey also removed D.R. from the mainstream Social Studies class in order to read to him when the nondisabled students would

read in class.  Rather than temporarily removing D.R. to a more restrictive environment, Ramsey could have chosen any of the aforementioned accommodations, which would have helped him to gain greater understanding of the material while remaining in the regular classroom.  Ramsey has not shown that D.R. could not benefit from receiving accommodations to help him learn the material while remaining in the less restrictive environment of the regular Social Studies classroom.        Second, in addition to failing to show that it considered and provided the whole range of supplemental aids and services before proposing to move D.R. to the segregated Social Studies class, Ramsey has also failed to show that it gave D.R. the benefit of the modifications and accommodations contained in his IEP.  Ramsey argues that "the IEPs in question included a variety of accommodations and modifications which D.R.'s teachers used as they deemed appropriate in their professional judgment on a case-by-case basis."  (Def.'s Opp'n Br. at 5.) Ramsey has not shown, however, that the IDEA allows a school district to provide accommodations and modifications contained in the IEP on a discretionary basis.  Although a school district may have discretion in choosing among educational methodologies, see <u>Lachman v. Illinois State Bd. of Educ.</u>, 852 F.2d 290, 297 (7th Cir. 1988), it does not have the discretion to decide whether a disabled student will be allowed the benefit of the modifications and accommodations provided in the student's IEP.  Presumably, the modifications and accommodations were included in the IEP after careful consideration by the IEP team as to what modifications and accommodations the student needed in order to receive a FAPE in the LRE. Individual teachers do not have the discretion to unilaterally revisit on a case-by-case basis the determination of the IEP team as to appropriate accommodations and modifications.

        Two examples of impermissible denials of modifications and accommodations illustrate

the point.  The first example concerns the provision in D.R.'s IEP which allows D.R. to retake

tests.  D.R.'s parents requested that D.R. be allowed to retake a Social Studies test on which he

received a 40% or "F".  Janell Luec testified that she would not automatically allow a student to

retake a test each time the student or his parent asks to retake a test.  In this case, Luec denied the

R.s' request that D.R. be allowed to retake the Social Studies test.  D.R. was not allowed to

retake any Social Studies tests in the eighth grade.  The opinions of Christine Murphy, Dr.

Balaban and Dr. Plasner are all in agreement that D.R. should have been allowed to retake tests.

Dr. Plasner testified that D.R.'s disabilities make him easily distractible and may make it difficult

for him to transfer information to long-term memory, and that retaking tests is a good teaching

technique.  The evidence shows that D.R. was improperly denied the benefit of retaking a test.

Likewise, the evidence shows that D.R. was improperly penalized for availing himself of

another modification contained in his IEP, *i.e.*, the modification of allowing D.R. extra time to

complete assigned work.  Ramsey agrees that due to his disabilities, D.R. takes longer than

nondisabled peers to complete his work.  In response to S.R.'s request that D.R. be given more

time to complete his homework, Luec ultimately allowed D.R. an extra day but deducted 10

points for tardiness.  D.R. should not have incurred a penalty for taking extra time, given the

disabilities, which were recognized by Ramsey and in his IEP, that require D.R. to take extra

time to complete his work.

In summary, the modifications and accommodations in D.R.'s IEP should have been

implemented by Ramsey.  The modifications and accommodations did not require "regular

educational instructors to devote all or most of their time to one handicapped child or to modify

the regular educational curriculum beyond recognition."  Daniel R.R., 874 F.2d at 1048.  Ramsey

has not shown that it made reasonable efforts to accommodate D.R. in the general Social Studies class with supplementary aids and services.

Finally, in addition to supplementary aids and services, the R.s also request an order directing Ramsey "to retain an educational consultant with expertise in including students like D.R. to provide training and technical support to D.R.'s regular and special education teachers in how to successfully include D.R. in regular science and social studies classes."  This request will be denied because the problem is not that Ramsey's staff was incapable of providing such accommodations and modifications, but rather that Ramsey's staff apparently chose not provide the accommodations and modifications that should have been provided so that D.R. could be educated in the least restrictive environment.  For example, Dr. Balaban testified that "the most obvious thing to do" to modify or adapt reading material was "in a study guide, to present the same material in a reduced form, a simplified form, and that is also very commonly done by support teachers.  It's really a job description that's a major thing that they do."  (1/29/04 Tr. at 55:12-18.)   The fact that a support teacher did not provide a study guide or other accommodations listed in the IEP does not show that the teacher did not know how to provide such modifications; for example, Young told Dr. Balaban that he did not provide a study guide or other accommodations because "after all, this was a mainstream class."  (1/29/04 Tr. at 51:16-21.)  Although Young's reasoning may have been erroneous, to remedy this failure by hiring an educational consultant to provide "training and technical support" appears to be a disproportionate remedy, especially when considered in light of the R.s' proposal that each support teacher receive two hours a week of training.  There is no indication that D.R.'s support teachers did not know how to properly supply a study guide and that they needed training in how

18

to provide a study guide, nor is there any indication that such extensive training is necessary for teachers who have received the training needed for certification in special education. The problem in D.R.'s eighth grade year was a problem of implementing the accommodations and modifications in his IEP and complying with the LRE requirement. A more appropriate remedy would be to find Ramsey in violation of the LRE requirement of the IDEA and to require Ramsey to provide – without leaving it to teachers' discretion – the accommodations and modifications contained in an IEP as well as to consider the whole range of supplementary aids and services.

(B) *Educational benefits of mainstream Social Studies class*

In examining whether a disabled child would receive educational benefit from regular education, the court should focus "on the student's ability to grasp the essential elements of the regular education curriculum." Daniel R.R., 874 F.2d at 1049. In comparing the educational benefits of integration versus segregation, special attention should be paid to the unique benefits of integration in a mainstream setting, "i.e., the development of social and communication skills from interaction with nondisabled peers." Oberti, 995 F.2d at 1216. A determination that a disabled child "might make greater academic progress in a segregated, special education class may not warrant excluding that child from a regular classroom environment." Id. at 1217 (recognizing that a disabled child may benefit differently from education in the regular classroom than nondisabled children).

In D.R.'s case, inclusion in the mainstream Social Studies class undoubtedly has educational benefits. The record shows that, based on standardized tests and grades in previous yeras, D.R. had the potential to grasp the essential elements of the eighth grade mainstream Social Studies class. Furthermore, D.R. would also be able to benefit from interaction with his

19

nondisabled peers.  Dr. Plasner and D.E.R. both testified that D.R. was motivated by, and felt he

belonged in, the mainstream Social Studies class, and to remove him would invalidate the

progress he had made in the last few years.  The benefits of integration outweigh any potential

benefits of segregation.

    *(C) Effect of D.R.'s presence on other students in eighth grade Social Studies class*

    Ramsey has not shown that D.R.'s presence in the eighth grade general Social Studies

class had a negative impact on the education of his nondisabled peers.  Ramsey admits that

D.R.'s presence did not interfere with the education of his nondisabled peers.  (Spar Aff. Ex. J,

item 19.)  Accordingly, this factor does not weigh in favor of placing D.R. in the resource Social

Studies class.

### III.  Science class – "exposure" without measurable goals and objectives, and pass/fail grading

    The R.s object to two provisions in the proposed 2003-04 IEP regarding D.R.'s eighth

grade Science education: (A) D.R. would be "exposed" to the general Science curriculum, and

(B) D.R. would be graded on a pass/fail basis.  Regarding the first provision, the R.s argue that

the ALJ failed to address the propriety under the IDEA of merely "exposing" D.R. to the

mainstream Science curriculum without establishing measurable goals and objectives to measure

D.R.'s progress.  Regarding the second provision, the R.s argue that Ramsey's proposal to grade

D.R. on a pass/fail basis violated the IDEA as well as the prohibition in Section 504 and the

ADA against disability-based discrimination.  For the reasons discussed below, summary

judgment will be granted to the R.s with respect to these two Science class-related issues.

    *(A) "Exposure" to curriculum without measurable goals and objectives*

The R.s argue that Ramsey's proposal to "expose" D.R. to the eighth grade Science curriculum without specifying any measurable goals or objectives violates the IDEA.  Ramsey argues that it provided measurable goals and objectives by placing D.R. in a mainstream Science class and providing for his exposure to the Science curriculum dictated by New Jersey's core curriculum standards without requiring mastery of the curriculum.  For the reasons set forth below, Ramsey's proposal to "expose" D.R. to the eighth grade Science curriculum without including measurable goals and objectives in the IEP is not in compliance with the IDEA.[5]

Ramsey would have been in compliance with the IDEA if, in proposing that D.R. be "exposed" to the Science curriculum without setting forth measurable goals and objectives, (1) Ramsey had complied with the procedures set forth in the IDEA, and (2) the IEP developed through those procedures had been reasonably calculated to enable D.R. to receive educational benefits.  Bd. of Educ. of the Hendrick Hudson Cent. School Dist. v. Rowley, 458 U.S. 176, 206-07 (1982).  The IDEA requires the inclusion in an IEP of a "statement of measurable annual goals, including benchmarks or short-term objectives" as well as a statement of how the child's progress toward annual goals will be measured and reported to the parents.  34 C.F.R. § 300.347(a)(2) and (7).  Accordingly, the IEP team was required to provide measurable goals and objectives for D.R. with respect to his eighth grade Science class.  Merely providing that D.R. would be "exposed" to the general Science curriculum without a statement of measurable goals

---

[5]It appears from the Proposed Order submitted by Plaintiffs that Plaintiffs are not seeking an order requiring that D.R.'s measurable goals and objectives be the core Science curriculum proficiencies.  Accordingly, this opinion will not address the propriety of holding D.R. responsible for the eighth grade core Science curriculum proficiencies but will only address the propriety of not including measurable goals and objectives in the IEP for D.R.'s eighth grade Science class.

and objectives is substantively insufficient because it was not reasonably calculated to enable D.R. to receive educational benefits from his eighth grade Science class.  "Exposure" to the general Science curriculum effectively meant that D.R. had no measurable goals or objectives – neither the core Science curriculum mandated by New Jersey nor an individually tailored curriculum applied.  Without a statement of goals and objectives, it would be difficult for D.R.'s parents and educators to structure D.R.'s Science education and to gauge D.R.'s progress. Ramsey has violated the IDEA's substantive requirement because Ramsey has not shown that it provided D.R. with measurable goals and objectives for his eighth grade Science class.

Ramsey's argument that it is not required to include goals in D.R.'s IEP may be correct if D.R.'s disabilities did not affect his ability to be involved and progress in the general Science curriculum.  See 34 C.F.R. Part 300 Appendix A ("[A] public agency is not required to include in an IEP annual goals that relate to areas of the general curriculum in which the child's disability does not affect the child's ability to be involved in and progress in the general curriculum.").  In this case, however, Ramsey states that "because the mainstream [Science] curriculum is extremely difficult to a student with D.R.'s language-based learning disabilities, the setting of more modest goals and a plan to educate him in the mainstream on an inclusionary basis was appropriate, calling for exposure to the mainstream curriculum without requiring its mastery." (Def.'s Opp'n Br. at 7.)  Ramsey therefore admits that D.R.'s disabilities affected his ability to be involved and progress in the mainstream Science curriculum.  In fact, Ramsey proposed that, due to his learning disabilities, D.R. should have goals and objectives that are more modest than those set by the state-mandated mainstream Science curriculum for nondisabled students. Ramsey should have, but did not, specify what the more modest goals and objectives would be.

22

Relatedly, Ramsey cannot simultaneously contend that D.R.'s "measurable goals and objectives are, by definition, those dictated by the state as applicable to all students" while also arguing that D.R. needed more modest goals (which Ramsey does not specify) because the mainstream Science curriculum was too difficult for D.R; such an approach would result in an impermissible lack of objective means to measure D.R.'s progress.

Ramsey argues that the formulation of goals and objectives should be left to the discretion of educators.  Ramsey notes that in Battle v. Pennsylvania, 629 F.2d 269 (3d Cir. 1980), the Court of Appeals ruled that "determination of appropriate educational goals, as well as the method of best achieving those goals, are matters which are to be established in the first instance by the states."  Id. at 278.  The ruling in Battle, however, is inapposite here because it does not excuse the utter lack of measurable educational goals for D.R. with respect to his eighth grade Science education.

Lastly, it bears mention that although the discussion above concerns Ramsey's proposal to "expose" D.R. to the general Science curriculum, a statement of measurable goals and objectives should be developed by the IEP team, which includes the parents as well as Ramsey staff.  "The parents of a child with a disability are expected to be equal participants along with school personnel, in developing, reviewing, and revising the IEP for their child."  34 C.F.R. Part 300 Appendix A, item 5.

*(B) Grading on a pass/fail basis*

The R.s argue that Ramsey's proposal to grade D.R. on a pass/fail basis violated the IDEA and also discriminated against D.R. in violation of Section 504 and the ADA.  With respect to alleged IDEA violations, the R.s argue that Ramsey unilaterally changed the IEP

without giving the R.s written notice of the change and that Ramsey has failed to show that giving D.R. pass/fail grades was needed to provide D.R. a FAPE.  With respect to the alleged violations of Section 504 and the ADA, the R.s allege that D.R. was the only student in his eighth grade Science class to not receive letter grades.  In response to these allegations, Ramsey contends that its educators decided to give D.R. pass/fail grades in order to reduce the pressure and frustration of receiving letter grades on D.R., who according to Ramsey has a history of behavioral difficulties triggered by academic frustration.  Ramsey contends that the challenging nature of the eighth grade Science curriculum would likely overwhelm D.R. in the absence of a pass/fail approach.  Ramsey argues that the decision concerning grading should be left to the discretion of educators.

The draft IEP given to S.R. at the May 20, 2003 IEP meeting stated that "Science class will be ungraded for inclusion purposes."  (Spar Aff. Ex. F.)  S.R. testified that at a June 12, 2003 IEP meeting, the Director of Special Services agreed to give D.R. letter grades in Science class.  Indeed, the final proposed IEP sent to the R.s for the 2003-04 school year provided that D.R. would receive a letter grade in Science.  (Spar Aff. Ex. J, item 84.)  The R.s contend that they first learned of Ramsey's intention, despite the final proposed IEP, to grade D.R. on a pass/fail basis when testimony began on December 1, 2003.  Despite Ramsey's purported intention to grade on a pass/fail basis, however, D.R. received letter grades for three out of four marking periods.  After the ALJ found that grading D.R. on a pass/fail basis was appropriate, Ramsey listed D.R.'s fourth marking period, final exam, and final grade for the class on a pass/fail basis.  In June 2004, the R.s requested that D.R. receive letter grades instead of "P" for pass.  In or around November 2004, Ramsey complied by changing his report card to show that

D.R. received a B- for the fourth marking period, B+ on his final exam, and a final grade of C+. (Harrison Second Aff. Ex. AA.)

Ramsey has not shown by a preponderance of the evidence that its proposal regarding pass/fail grading in Science class complied with the IDEA's procedural and substantive requirements.  With respect to the IDEA's procedural requirements, Ramsey has not refuted the R.s' claims that Ramsey had agreed to give D.R. letter grades in Science, that the final IEP provided that D.R. would receive letter grades, or that the R.s first found out during the OAL hearing that Ramsey had nevertheless decided to give D.R. pass/fail grades.  The IDEA requires that "[w]ritten prior notice [must be given] to the parents of the child . . . whenever the local educational agency proposes to initiate or change . . . the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child."  20 U.S.C. § 1415(b)(3); see also N.J.A.C. 6A:14-2.3(d).  Among other things, the written notice must include "a description of the action proposed or refused by the agency" and "an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action."  20 U.S.C. § 1415(c).  Ramsey failed to give the R.s proper written notice of its intended departure from D.R.'s final proposed IEP with respect to the grading system for D.R. in his Science class.  The lack of notice misled the R.s into believing that the issue of grading had been resolved because the parties had previously discussed the issue and Ramsey had represented to the R.s that it would give D.R. letter grades in Science class.  Ramsey cannot disregard the IEP provision that D.R. would receive letter grades in Science class by raising the issue of grading for the first time at the OAL hearing.

With respect to the IDEA's substantive requirements, Ramsey has failed to show by a preponderance of the evidence that grading D.R. on a pass/fail basis was appropriate or reasonably calculated to provide educational benefits.  Ramsey has not produced evidence to substantiate its purported concern that D.R. would be frustrated by receiving letter instead of pass/fail grades.  In its response to item 43 of Plaintiffs' Rule 56.1 Statement of Material Facts, Ramsey admits that "it produced no evidence showing that D.R. had experienced stress due to the receipt of letter grades in his seventh grade Science class."  Additionally, the ALJ noted that "[i]n this proceeding negative behavior by D.R. has not been at issue."  (Harrison Second Aff. Ex. Q at 13.)  Ramsey has also not shown that the purportedly challenging nature of the eighth grade Science curriculum would have been resolved by giving D.R. pass/fail grades.

With respect to the R.s' discrimination claims, Ramsey's decision to grade D.R. on a pass/fail basis in Science class constituted disability-based discrimination because the pass/fail grading system deprived D.R. of a benefit given to all other students in his Science class, including other disabled students.  Additionally, the decision to grade D.R. on a pass/fail basis was not contained in the final proposed IEP.

The Court of Appeals has noted that the requirements imposed by Section 504 substantially duplicate those provided under the IDEA.  W.B. v. Matula, 67 F.3d 484, 492-493 (3d Cir. 1995) (noting that "[t]here appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition").  Section 504 of the Rehabilitation Act prohibits any federally funded program from discriminating against persons with disabilities:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance . . .

29 U.S.C. § 794(a).  To establish a violation of Section 504, the R.s must show that: (1) D.R. has a disability; (2) D.R. is "otherwise qualified" to participate in school activities; (3) Ramsey receives federal financial assistance; and (4) D.R. was excluded from participation in, denied the benefits of, or subject to discrimination at school.  W.B. v. Matula, 67 F.3d at 492 (citations omitted).  The R.s need not establish that Ramsey intended to discriminate in order to prevail.  Id.  The ADA prohibits discrimination against a person with a disability by reason of such disability.  42 U.S.C. § 12132.  Generally, the same analysis under Section 504 applies in determining whether a defendant's actions violate the ADA.  Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 279 (3d Cir. 1996).

The only issue here is whether Ramsey's proposal to give D.R. pass/fail instead of letter grades in Science class excluded D.R. from participation in, denied him the benefits of, or subjected him to discrimination because of his disability.  In Letter to Runkel, 25 IDELR 387 (Sept. 30, 1996), the Office for Civil Rights ("OCR") indicated that, unless otherwise stated on a student's IEP, the disabled student is presumed to be assessed and graded as per the school's policies.  THE OCR letter ruling stated that, "with respect to grades, class ranking, honor rolls, graduation, and diplomas, students with disabilities must be treated the same as all other students."  Id.  Generally, a different grading system for a disabled student who participates in the general curriculum, as D.R. did with respect to eighth grade Science, will be permitted only if the student's IEP team determines that the different grading system would appropriately address the student's individual needs.  Id.  ("We agree with your conclusion, and particularly with the discussion that the student's individualized education program (IEP) should discuss any grading

modifications that may apply, particularly with respect to subjects completed in a general education setting.")  In this case, the pass/fail grading system was not included in D.R.'s proposed IEP.  In fact, an earlier version of the proposed IEP, which had specified a pass/fail grading system, was revised after discussion between the R.s and Ramsey such that the final proposed IEP stated that D.R. would receive letter grades.  Ramsey cannot thereafter unilaterally announce a contrary decision to change D.R.'s letter grade system outside of the IEP team process.  The R.s have shown that the decision to grade D.R. on a pass/fail basis impermissibly deprived D.R. of the benefits of receiving a more precise assessment and acknowledgment of his progress, which were benefits enjoyed by other students in his class.

Accordingly, summary judgment will be granted to the R.s with respect to their IDEA, Section 504, and ADA claims concerning the lack of measurable goals and objectives and Ramsey's proposal to grade D.R. on a pass/fail basis.

**IV.  Social skills program**

The parties agreed that D.R. needed training in social skills.  At the May 20, 2003 IEP meeting, Ramsey proposed the Step Up program, which would begin with one-on-one instruction and progress to a group setting in which D.R. could practice the social skills learned previously in the one-on-one instruction.  Ramsey argues that "[t]he timing and extent to which such training would include interaction with non-disabled peers should be left to the discretion of . . . the certified professional hired to provide the training." (Def.'s Br. at 25.)  The R.s, on the other hand, argue that the Step Up Program is inappropriate and insist that any social skills training should involve D.R.'s nondisabled peers rather than one-on-one instruction.  The R.s argue that the Step Up program is inappropriate because it is designed for children with autism and

28

Asperger's syndrome.  Ramsey argues that the Step Up program, in addition to being designed

for children with autism or Asperger's syndrome, is also designed to serve students with social

skill deficits like D.R..  Finally, the R.s argue that offering social skills training on a pullout basis

constitutes discrimination under Section 504 and the ADA.  For the following reasons, summary

judgment will be granted in part to the R.s because Ramsey has failed to show that the Step Up

Program was appropriate for D.R. or that D.R.'s social skills program should not involve

disabled peers.  Summary judgment will be granted in part to Ramsey with respect to the R.s'

discrimination claims.

  Ramsey has not shown by a preponderance of the evidence that the Step Up Program was

appropriate for D.R. or that the Step Up Program was "reasonably calculated to enable D.R. to

receive educational benefits."  Rowley, 458 U.S. at 206-07.  Ramsey contends that "the record

demonstrates that the Step-Up was developed not only to train Aspergers and autistic students,

but also to address the social limitations of students like D.R."  (Def.'s Br. at 25.)  The record

includes a Step Up Program brochure that describes the program as being "targeted for learners

who are diagnosed with Aspergers or High Functioning Autism or who exhibit the symptoms

associated with these disabilities."  (Spar Aff. Ex. J, item 90.)   Therefore, the Step Up Program

conceivably could be appropriate for children with disabilities other than Asperger's or autism.

Ramsey has not shown, however, that D.R. "exhibit[s] the symptoms associated with"

Asperger's or autism.  In contrast, Dr. Plasner testified that a social skills program developed for

students with Asperger's would be highly inappropriate for D.R., whose impediments to

socialization are different than an Asperger's or autistic child.   For example, Dr. Plasner testified

that D.R.'s social reasoning is average, which is not usually the case in a child with Asperger's.

Dr. Plasner explained that D.R.'s impediment to socialization is a communication or articulation disorder that might make it difficult to understand D.R. rather than problems of social perception that usually impede children with Asperger's.  (1/30/04 Tr. at 93:13 – 95:1.)  Ramsey has not produced evidence to refute Dr. Plasner's opinion.  Additionally, Ramsey's argument concerning the involvement of Christine Robertello in providing the Step Up Program for D.R. has no persuasive value for two reasons: (1) the appropriateness of the Step Up Program does not depend on who would implement the Step Up Program for D.R., and (2) Robertello told S.R. that she does not implement the Step Up Program.[6]

Furthermore, Ramsey's own statements indicate that it did not have a sufficient basis upon which to determine whether the Step Up Program would be appropriate.  Ramsey admits that "while sessions with non-disabled peers during lunch might be appropriate, it is impossible to determine prior to the first session if and when they would be appropriate."  (Def.'s Opp'n Br. at 9.)  Furthermore, Ramsey admits that it did not share any of D.R.'s school records or confidential information about his disabilities, his functioning in school and with his peers with Jan Borda, a therapist and social worker in the Step Up Program.  (Spar Aff. Ex. J, items 91-92.) Therefore, the would-be provider of the Step Up Program did not have sufficient information to determine whether the Step Up Program would be appropriate for D.R.

Because Ramsey has failed to show by a preponderance of the evidence that the Step Up

---

[6]Moreover, in a previous proceeding ALJ Springer did not find that Robertello was qualified to serve as D.R.'s social skills counselor in the Step Up Program.  Neither ALJ Springer nor this court approved Robertello as a social skills counselor; in fact, the previous proceeding did not concern the Step Up Program.  Rather, the opinions of ALJ Springer and this court concerning a previous school year concerned Robertello's qualifications only as a behavioral consultant and not a social skills counselor.

Program was reasonably calculated to provide benefits to D.R., summary judgment will be granted to the R.s.

In addition to arguing that the Step Up Program was inappropriate, the R.s also argue that an appropriate social skills program should include two provisions.  First, the R.s insist that social skills training should take place with nondisabled peers.  Ramsey has not adopted a diametric position but argues that the question of involving nondisabled peers is not a question of whether, but when, social skills training will involve nondisabled peers.  Second, the R.s insist that social skills training should take place during lunch and not on a pullout basis.  Ramsey contends that both issues should be resolved by "the certified professional hired to provide the training."  (Def.'s Br. at 25.)  According to Ramsey, the specificity requested by the R.s regarding the time and manner of social skills training "would defy the very nature of social skills training, which by definition turns on the student's social function level at the outset of the year and his progress as the year proceeds."  (Def.'s Opp'n Br. at 9.)  Because Ramsey has not shown that D.R. is not ready for social skills training that would involve his nondisabled peers, the IEP team will be required to develop a social skills program for D.R. that will involve his nondisabled peers.

In support of their insistence that nondisabled peers should be involved, the R.s offer the opinion of Dr. Plasner, who testified that social skills training should involve interaction with nondisabled peers and that "one on one [instruction] wouldn't really be appropriate or significant for D. in terms of developing social skills."  (1/30/04 Tr. at 95-9-12.)  Dr. Plasner recited the following benefits of providing social skills training in a group setting with nondisabled peers: allowing D.R. to observe his nondisabled peers' communication skills and to practice his social

31

skills in a safe setting.  (Id. at 95:16-96:5.)   Ramsey does not refute Dr. Plasner's opinion.

Rather, Ramsey argues that before it can commit to the R.s' request for the immediate

involvement of nondisabled peers, the provider of social skills training should "meet with D.R.,

acquire familiarity with his strengths and weaknesses, assess his present level of social skills and

develop an individualized plan – one which permits ongoing adjustment based on his

performance and contemplates interaction with non-disabled peers as appropriate – not simply

when demanded by D.R.'s parents."  (Def.'s Br. at 26.)  Apparently, Ramsey has not had the

opportunity to provide a social skills expert with any information concerning D.R. in order to

receive an expert opinion as to what would be an appropriate social skills program.  Ramsey

therefore cannot, and has provided no basis to, refute the R.s' assertion that nondisabled peers

should immediately be involved in D.R.'s social skills training.  Ramsey's apparent inability to

meet its burden of proof, together with the testimony of Dr. Plasner, support a finding that D.R.'s

social skills training should involve his nondisabled peers.

        The next social skills issue concerns pullout.  The R.s contend that providing social skills

training on a pullout basis would constitute disability-based discrimination in violation of

Section 504 and the ADA.  Ramsey argues that providing social skills training on a pullout basis

would not constitute disability-based discrimination because the "IDEA-based mandate of an

*individualized* education plan means that when a disabled student demonstrates a deficiency in

social skills, the district *must treat him differently* from his non-disabled peers and provide him

with special training."  (Def.'s Br. At 39) (emphasis in original).  Here, in order to show

disability-based discrimination, the R.s must prove that pullout would exclude D.R. from

participation in, deny him the benefits of, or subject him to discrimination at, the school.  See

Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 253 (3d Cir. 1999).  Such a showing has not been made, and Defendant has the more persuasive argument.

The regulations cited by the R.s – *i.e.*, 34 C.F.R. §§ 104.4(b), 104.37 – do not require that a disabled child have an opportunity to participate in every session of every class that occurs during the school day without considering the individual needs of the disabled child.  In D.R.'s case, both parties agree that D.R.'s individual needs include social skills training, which nondisabled children typically do not need.  In order to provide this necessary training, D.R.'s schedule may need an adjustment that nondisabled students do not need, such as pullout.  If social skills training were to be provided on a pullout basis, D.R. would not be denied access to academic or non-academic programs; he would still have the opportunity to participate in these programs in addition to receiving social skills education.  In this way, D.R.'s schedule would be able to accommodate the individualized education he needs.

Although pullout would not constitute disability-based discrimination *per se*, the finding that D.R.'s social skills education should involve his nondisabled peers would suggest that the most logical time to provide social skills training would be during lunch or a similarly free period rather than on a pullout basis.  Logistically, social skills training that involves interaction with nondisabled peers must occur at a time which would not interrupt the education of nondisabled peers.  Nondisabled students cannot be pulled out of their classes in order to participate in the social skills training of a disabled peer.  Lunch is one of the few periods during the school day in which there is a coincidence of free time among D.R. and some of his nondisabled peers.  Accordingly, although providing social skills education on a pullout basis does not constitute a *per se* violation of Section 504 or the ADA, Ramsey should give serious consideration to

providing social skills training during lunch or a period in which all student participants would be free to participate in D.R.'s social skills training.

## V.  Fees and costs (Count One)

The R.s seek attorneys fees and costs in connection with the ALJ's February 5, 2004 decision and order and April 14, 2004 consent order.  On February 5, 2004, the ALJ ruled that Ramsey must allow D.R. to participate in the preparatory classes for the GEPA exam as well as the GEPA exam itself.  The consent order dated April 14, 2004 provided that the Director of Special Services would not attend that portion of D.R.'s IEP meetings in which his transitional needs and services would be discussed.  Counsel for the R.s represents that her current hourly rate is $300.000 per hour and that she has spent 375 hours in connection with the due process hearing.  Based on these figures, the lodestar for the due process hearing would be $112,500.00.  The R.s argue that although they did not prevail at the administrative level with respect to the issues on appeal here, most of the time spent by counsel on these issues allegedly also pertained to D.R.'s participation in the GEPA exam.  The R.s contend that out of the 375 total hours spent by counsel on the due process hearing, only 78.2 hours were not relevant to the GEPA issue.  Accordingly, the R.s seek attorney's fees in the amount of: 296.8 hours * $300.00 = $89,040.00.

In addition to attorney's fees, the R.s also seek reimbursement in the amount of $3,413.16 for filing fees, telephone, postage, copying, Lawyers Service and Westlaw charges incurred in connection with the due process hearing.  Lastly, the R.s seek reimbursement for two experts' fees and a "psychoeducational evaluation" totaling $11,598.20.

To summarize, the R.s seek a grand total of $104,051.36 incurred in connection with the administrative proceeding.

34

In its discretion, the court may award attorney's fees to a prevailing party in an IDEA action.  See 20 U.S.C. § 1415(i)(3)(B).  A "prevailing party" for attorney's fees purposes is a party that succeeds on any significant issue in litigation which achieves some of the benefit the party sought in bringing suit.  John T. v. Delaware County Intermediate Unit, 318 F.3d 545, 555 (3d Cir. 2003) (citation omitted).  A party must be successful in the sense that it has been awarded some relief by a court.  Id. at 556 (holding that the holding in Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res., 532 U.S. 598 (2001), which concerned attorney's fees to a prevailing party under the Fair Housing Amendments Act and the ADA, applies to the fee-shifting provision in the IDEA).  "[T]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Id. at 555 (citation omitted).  The Court of Appeals has applied a two-pronged test to determine whether parents are the prevailing party: (1) whether plaintiffs achieved relief and (2) whether there is a causal connection between the litigation and the relief from the defendant.  Wheeler v. Towanda Area School Dist., 950 F.2d 128, 131 (3d Cir. 1991) (citation omitted). Litigation is causally related to the relief if it changed the legal relations of the parties such that defendants were legally compelled to grant relief.  Id. at 132.

The R.s qualify as a prevailing party.  They have succeeded in obtaining relief on two issues in their favor: (1) the ALJ's February 5, 2004 decision and order relating to the GEPA and (2) the April 14, 2004 consent order relating to the participation of the Director of Special Services in D.R.'s IEP meetings.  Accordingly, the R.s are entitled to reasonable attorney's fees.

Given that the R.s have met the generous "prevailing party" threshold, "[i]t remains for

the district court to determine what fee is 'reasonable.'" Hensley, 461 U.S. at 433.  What is

reasonable is the crux of the dispute concerning the amount of attorney's fees.  Where plaintiffs'

claims arise out of a common core of facts and involve related legal theories, "the most critical

factor is the degree of success obtained."  Hensley v. Eckerhart, 461 U.S. 424, 436 (1983) Where

a plaintiff has achieved only partial or limited success, the product of hours reasonably expended

on the litigation as a whole times a reasonable hourly rate may be an excessive amount.  Id.  To

arrive at a reasonable fee award, a district court should exercise its equitable discretion "either by

attempting to identify specific hours that should be eliminated or by simply reducing the award to

account for the limited success of the plaintiff."  Tex. State Teachers Ass'n v. Garland Indep.

Sch. Dist., 489 U.S. 782, 789-790 (1989) (citing Hensley v. Eckerhart, 461 U.S. at 437 and

Blanchard v. Bergeron, 489 U.S. 87, 96 (1989)).  "Accordingly, a court must reduce the fee

award if 'it concludes the benefits of the litigation were not substantial enough to merit the full

amount of the lodestar.'"  McDonnell v. United States, 870 F. Supp. 576, 587 (D.N.J. 1994)

(citation omitted).

Here, the relief obtained by the R.s in connection with the due process petition is limited,

and the limited degree of success should be taken into account when awarding fees.  It is clear

that the R.s achieved only limited success in light of their failure to secure most of the relief

requested in their due process petition, which is on appeal in this action.  The requested award of

$89,040.00 for attorney's fees should be reduced accordingly to reflect the degree of success.

Although a claim-by-claim calculation of services for which the R.s were successful and those

for which the R.s were unsuccessful cannot be conducted given the common core of facts and

related legal theories, in light of the record, a reduction of 2/3 of the R.s' requested

36

reimbursement – *i.e.*, $29,680.00 – represents reasonable attorney's fees for the litigation before the ALJ, considering the significance of the overall relief obtained by the R.s in relation to the hours reasonably expended on the litigation.

Expenditures such as photocopying, travel, long distance telephone and postage have also been awarded to prevailing parties in IDEA actions as part of attorney's fees.  B.K. v. Toms River Bd. of Educ., 998 F. Supp. 462, 476 (D.N.J. 1998) (citations omitted).  These clerical fees appearing reasonable, Ramsey will be ordered to pay $3,413.16.

The R.s also argue that they are entitled to expert fees and for the cost of a July 2003 psychoeducational evaluation totaling $11,598.20 for Dr. Mae Balaban and Dr. Joseph Plasner. Under the IDEA, a prevailing party is entitled to reimbursement for reasonable experts' fees as part of the attorney's fees award.  Bailey v. District of Columbia, 839 F. Supp. 888, 892 (D.D.C. 1993).  The fees and cost appear reasonable.  Ramsey will be ordered to pay $11,598.20 for experts' fees the cost of the psychoeducational evaluation.

The R.s may make a separate application on account of the success enjoyed in this action.

## *CONCLUSION*

For the foregoing reasons, the ALJ opinion will be reversed, the R.s' motion for summary judgment will be granted in part and denied in part, and Ramsey's motion for summary judgment will be denied in part and granted in part.  As a prevailing party, the R.s will be entitled to $44,691.36 for attorney's fees and costs.

An appropriate order will be issued.

/s/  Dickinson R. Debevoise
Dickinson R. Debevoise, U.S.S.D.J.

May 3, 2005